IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                                              Criminal No. 23-146

BRIAN DIPIPPA
KRYSTAL DIPIPPA

## GOVERNMENT'S OMNIBUS BRIEF IN RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS

AND NOW comes the United States of America, by its attorneys, Eric G. Olshan, United States Attorney for the Western District of Pennsylvania, and Shaun E. Sweeney, Assistant United States Attorney for said District, and submits this Omnibus Brief in Response to Defendants' Pretrial Motions (Document Numbers 77-89).

Pretrial motions have been filed by the defendants in this case. The motions are premature, moot and/or lack merit based on established law and the existing record. Each of the motions should, therefore, be denied without an evidentiary hearing.

## I.      RESPONSE TO MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE AND IMPEACHMENT EVIDENCE (Doc. No. 77)

In the Motion for Production of Exculpatory Evidence and Impeachment Evidence (Doc. No. 77), defendant Brian DiPippa requests that the government provide him with all exculpatory evidence possessed by the government. He makes this request pursuant to Brady v. Maryland, 373 U.S. 83 (1963). Defendant Brian DiPippa's request is not only for evidence which exculpates him, but also for evidence which would tend to impeach the credibility of witnesses whom the government intends to call at trial. In support of this latter request, defendant Brian DiPippa cites to the cases of Giglio v. United States, 405 U.S. 150 (1972) and United States v. Perdomo, 929 F.2d 967 (3d Cir. 1991).

### A.   The Brady Requests

Under Brady v. Maryland, supra, and its progeny, the government has the obligation to disclose exculpatory evidence - evidence that is favorable and material to the defense. Strictly speaking, Brady "'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984) (citation omitted).

> Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence. If the exculpatory evidence "creates a reasonable doubt" as to the defendant's culpability, it will be held to be material.

Id. at 260 (citations omitted). See also United States v. Bagley, 473 U.S. 667, 682 (1985) (Evidence is "material" when it is reasonably probable that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different."). Brady material must be disclosed "in time for its effective use at trial." United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983).

The government is unaware of any undisclosed exculpatory Brady material pertaining to the defendants at this time, but recognizes its continuing obligation to disclose such materials when the government becomes aware of them.

### B.   Witness Impeachment Materials

The law does not require the government to make early disclosures of witness impeachment materials. However, the early production schedule proposed by the government, as explained in more detail below, will avoid the risk of delaying trial and will help guard against requiring the United States to make what can be an unfair early disclosure.

It is well established that "a criminal defendant does not have the right to full discovery of the government's case." United States v. Casseus, 282 F.3d. 253, 257 (3d Cir. 2002).  Regarding witness information, "the [criminal] discovery rules do not permit the defense to get the names of witnesses." United States v. Mitchell, 540 F.2d 1163, 1166 (3d Cir. 1976); accord Casseus, 282 F.3d at 257 (affirming district court's refusal to order pretrial discovery of the government's witness list; United States v. Addonizio, 451 F.2d 49, 62 (3d Cir. 1972) ("in no event is the government required to divulge the identity of its witnesses in a noncapital case"). See also United States v. DiPasquale, 740 F.2d 1282, 1294 (3d Cir. 1984); Government of the Virgin Islands v. Ventura, 476 F.2d 780, 781 n.1 (3d Cir. 1973).

The government's proposed early disclosure of Jencks and witness impeachment materials, fourteen days prior to trial, is far more generous than the law requires and will permit defense counsel to make effective use of such materials at trial.  It is well settled that disclosure of evidence that may be used to discredit government witnesses, and that is not directly exculpatory as to a defendant's substantive guilt, need not be disclosed in advance.  The Third Circuit held in United States v. Higgs, supra., that disclosure of witness credibility evidence at the time of trial sufficiently ensures a defendant's right to a fair trial:

> No denial of due process occurs if Brady material is disclosed to [the defendant] in time for its effective use at trial.... The Brady material in this case was information that [the defendant] could use on cross-examination to challenge the credibility of government witnesses. For that type of material, we think [the defendant's] right to a fair trial will be fully protected if disclosure is made the day that the witness testifies.  Disclosure at that time will fully allow [the defendant] to effectively use that information to challenge the veracity of the government's witnesses.

Higgs at 44.

In Higgs, the court specifically rejected the argument "that the requested information might also be used by defense counsel for investigating their case." Id. at 43 n.5.  The Higgs defendants

claimed "that knowledge of who the government's witnesses were and how they fit into the alleged conspiracy might lead to other evidence pertinent to the issue of substantive guilt or innocence." Id.  In addition, the Higgs defendants asserted "that the information must be provided before trial to allow them sufficient time to prepare their case."  Id.

The Third Circuit disagreed, holding that "the requested information" was not "Brady material for that purpose."

> While that information is material for impeachment purposes, names and addresses of witnesses and what they have been promised by the government for their cooperation absent other evidence, sheds little if any light on the underlying question of substantive guilt.  Thus that information would not be material under the appropriate [United States v.] Agurs test [427 U.S. 97 (1976)], and *would not need to be disclosed by the government under Brady.*

Id. (emphasis added).

The United States readily acknowledges that the relevant case law of the Third Circuit promotes the early disclosure of all Brady material, including strictly impeachment evidence at trial.  See Starusko, 729 F.2d at 261 (reaffirming appellate court's longstanding policy which encourages early production of Brady material and leaving undisturbed the district court's discretionary order that delivery of impeachment material two weeks prior to trial was sufficient); United States v. Kaplan, 554 F.2d 577, 578 (3d Cir. 1977) ("we disapprove and discourage a practice of delayed production"); Government of the Virgin Islands v. Ruiz, 495 F.2d 1175, 1179, (3d Cir. 1974) (encouraging "an affirmative policy of prompt compliance").  Local Criminal Rule 16(C) requires "subject to a continuing duty of disclosure, the government shall notify the defendant of the existence of exculpatory evidence, ...."

The government's disclosure of the impeachment materials two weeks prior to the start of trial will adequately address these concerns.

WHEREFORE, the United States respectfully requests that defendants' Motion for Production of Exculpatory Evidence and Impeachment Evidence (Doc. No. 77) be denied.

## II.   RESPONSES TO DEFENDANT BRIAN DIPIPPA'S MOTION TO PRODUCE EVIDENCE THAT THE GOVERNMENT INTENDS TO USE UNDER FEDERAL RULES OF EVIDENCE 404(B) AND 609 WITH CITATION OF AUTHORITY (Doc. No. 78) AND DEFENDANT KRYSTAL DIPIPPA'S MOTION REQUESTING NOTICE PURSUANT TO RULE 404(B) (Doc. No. 88)

In the Motion for to Produce Evidence that the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 With Citation of Authority (Doc. No. 78), defendant Brian DiPippa requests that the Court direct the government to provide notice of its intent to offer evidence pursuant to Rule 404(b) of the Federal Rules of Evidence.  Defendant Krystal DiPippa has filed a similar request at Doc. No. 88.  Defendant Brian DiPippa also requests, in Doc. No. 78, that the government be directed by the Court to provide notice to him pursuant to Rule 609 of the government's intent to impeach him using prior criminal convictions in the event that defendant Brian DiPippa would choose to testify at the trial.  The following is the government's response to both of those Motions.

Rule 404(b) of the Federal Rules of Evidence requires the government to provide defendants with reasonable notice, in advance of trial, of the general nature of any evidence which the government intends to offer at trial under Rule 404(b).

Rule 404(b) of the Federal Rules of Evidence provides that "[o]n request by a defendant in a criminal case, the prosecutor must…provide reasonable notice of the general nature [of other crimes, wrongs, or acts] the prosecutor intends to offer at trial" and generally must do so prior to trial.  Fed.R.Evid. 404(b).  Evidence of other crimes, wrongs or acts "may be admissible for [certain] purpose[s], such as [proof of] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Id.

The government in this case is aware of the requirement under Rule 404(b) to provide such notice and will do so at least two weeks prior to trial.  See, e.g., United States v. Jordan, No. 02: 12-cr-162, 2013 WL 5615594, *9 (W.D.Pa. Oct. 7, 2013) (Rule 404(b) material due two weeks before trial).  See also, United States v. Buckner, No. 3:18-cr-00349, 2020 WL 211403, at *6 (M.D. Pa. Jan. 13, 2020) (collecting cases and noting that "[c]ourts have thus frequently found that the Government must disclose Rule 404(b) evidence no less than one to two weeks prior to trial.").  Therefore, at least two weeks prior to trial, the government will inform the defendants of "the general nature of any such evidence" that it intends to admit pursuant to Rule 404(b).  However, at this time, the government has not yet made a determination as to whether any such evidence will be offered at the trial, which has not yet been scheduled.

With respect to any impeachment evidence to be used by the government under Rule 609, government counsel will advise defense counsel, and obtain approval from the Court, prior to questioning any defendant about any prior criminal conviction.

WHEREFORE, the United States respectfully requests that defendants' Motions filed at Doc. Nos. 78 and 88 be denied.

### III.  RESPONSE TO MOTION FOR EARLY RELEASE OF JENCKS WITH CITATION OF AUTHORITY (Doc. No. 79)

In the Motion for Early Release of Jencks with Citation of Authority (Doc. No. 79), defendant Brian DiPippa asks the Court to direct the government to provide defense counsel with the Jencks materials for the government's witnesses at least fourteen days prior to the commencement of trial.  The government does not object to this request and will disclose the Jencks materials fourteen days prior to the start of trial.

WHEREFORE, the United States respectfully requests that the Motion for Early Release of Jencks With Citation of Authority (Doc. No. 79) be denied as moot.

## IV.    RESPONSE TO MOTION FOR DISCOVERY PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 16 WITH CITATION OF AUTHORITY (Doc. No. 80)

In the Motion for Discovery Pursuant to Federal Rule of Criminal Procedure 16 with Citation of Authority (Doc. No. 80), defendant Brian DiPippa cites to Fed.R.Crim.P. 16, and its subparagraphs, in support of his request for discovery.  The government's response is that the government has complied with Rule 16 to date, and will continue to do so, as the case gets closer to trial and the government makes more decisions regarding which evidence will be offered at trial.

In addition to seeking discovery of the types of evidence specifically described in Rule 16, defendant Brian DiPippa makes several more requests which are much broader in scope than the types of discovery required to be produced by the government under Rule 16.  In particular, defendant Brian DiPippa makes requests for all information pertaining to a variety of covert investigative techniques which may have been used by federal law enforcement agencies in the investigation of this case, such as the use of covert surveillance, email covers and other investigative tools.  In addition, defendant Brian DiPippa requests that the government be required to provide information relating to the use of confidential human sources.  Finally, defendant Brian DiPippa requests court ordered production of a list of "all documents used, obtained or written in connection with the investigation preceding the indictment," including items which the government may have destroyed, such as rough notes, interviews, reports, memoranda and subpoenaed documents.  Because these requests seek materials beyond the scope of discovery required by Rule 16, they should be denied.

The law is well settled that "[c]riminal pretrial discovery is, of course, vastly different from discovery in civil cases." United States v. Ramos, 27 F.3d 65, 67-68 (3d Cir. 1994). "In contrast

to the wide-ranging discovery permitted in civil cases, Rule 16 of the Federal Rules of Criminal Procedure delineates the categories of information to which defendants are entitled in pretrial discovery in criminal cases, with some additional material being discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." Id.; "[I]t is clear that a criminal defendant does not have the right to full discovery of the government's case."). Casseus, supra. at 257.

As the Supreme Court explained in United States v. Ruiz, 536 U.S. 622, 629 (2002), the Constitution does not require the government to share "all useful information" with the defendant during discovery. In particular, the government is not required to disclose impeachment material relating to informants or other witnesses, as premature disclosure could "disrupt ongoing investigations," expose prospective witnesses to "serious harm," and would place a substantial "burden" on the government prior to trial preparation. Id. at 631-33.

The United States recognizes and intends to comply with its obligations under Rule 16, as well as its obligations under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), Rules 12 and 26.2 of the Federal Rules of Criminal Procedure, Local Rule 16C and the Jencks Act, 18 U.S.C. § 3500. Further, the United States is always willing, in a spirit of mutual cooperation, to consider and discuss with defense counsel any reasonable request by a defendant.

The United States notes, however, that its obligation to make available pretrial discovery materials is governed primarily by Rule 16 of the Federal Rules of Criminal Procedure. That rule requires the government to produce certain categories of information upon request of the defendant: 1) the defendant's statements that are in written or recorded form (including grand jury testimony) and any oral statement given by the defendant to a person then known by the defendant

to be a government agent (Rule 16(a)(1)(A) & (B)); 2) the defendant's prior criminal record (Rule 16(a)(1)(D)); 3) all documents and tangible objects within the possession, custody or control of the government which are material to the preparation of the defendant's defense or are intended for use by the government as evidence-in-chief at the trial, or were obtained from or belong to the defendant (Rule 16(a)(1)(E)); 4) results or reports of physical or mental examinations or other types of scientific tests in the government's possession which are material to the preparation of the defense or are intended for use by the government as evidence-in-chief at the trial (Rule 16(a)(1)(F)); and 5) a written summary of expert testimony the government intends to use during its case-in-chief at trial (Rule 16(a)(1)(G)).

Throughout the pendency of this case, the United States has made ongoing disclosures of evidence and information.   Those disclosures have been extensive and comport with the requirements of Rule 16.   The government has complied with its Federal Rule of Criminal Procedure 16 discovery obligations by either copying and providing the Rule 16 discovery information to the defendants or otherwise making such information available to the defendants. Further, the government intends to continue to comply with Rule 16 as we get closer to trial and decisions are made regarding trial exhibits and the scope of anticipated expert testimony.

WHEREFORE, the United States respectfully requests that defendants' Motion for Discovery Pursuant to Federal Rule of Criminal Procedure 16 with Citation of Authority (Doc. No. 80) be denied.

## V.   RESPONSE TO MOTION TO REQUIRE PRESERVATION OF AND PRODUCE ROUGH NOTES WITH CITATION OF AUTHORITY (Doc. No. 81)

In the Motion to Require Preservation of and Produce Rough Notes with Citation of Authority (Doc. No. 81), defendant Brian DiPippa alleges that several law enforcement agencies have been involved in the investigation of this case and have conducted interviews of witnesses as

part of the investigation.  He therefor requests that these law enforcement agencies be directed to maintain any and all rough notes they may have created in connection with those interviews.  In support of this request, defendant Brian DiPippa cites to several cases where Courts have held that such notes are potentially discoverable under Rule 16, the Jencks Act, and/or Brady v. Maryland, 373 U.S. 83 (1963).

The government is aware of its obligations under United States v. Ammar, 714 F.2d. 238 (3d Cir. 1983), United States v. Vella, 562 F.2d 275 (3d Cir. 1977), and United States v. Ramos, 27 F.3d 65 (3d Cir. 1994).  These cases require the government's agents to preserve rough notes created during an investigation.  Thereafter, upon motion of the defense, the government must then provide the notes to the district court for a determination that they should be produced on the basis that they contain Brady or Jencks Act material.  Ammar, 714 F.2d at 259.

While the government does not oppose the granting of a motion requiring the preservation of these notes, the government does oppose any order requiring the present disclosure of the notes to defendant, as such an order would be contrary to the law of this Circuit under Ammar and its progeny.

Government counsel has directed the federal and non-federal law enforcement officers involved in this case to retain copies of any notes they have taken.  The government will obtain copies of any such notes for review and production to the Court, if necessary.

Government counsel notes that non-federal law enforcement officers were involved in this investigation prior to the filing of federal charges.  The government had no control over the retention of notes by those investigators during their investigation.  Many non-federal investigators do not routinely retain their notes.  However, government counsel has asked them to retain any notes they still have from their investigation, and they have been advised that they must keep any

notes they take (or have taken) as part of the federal prosecution.

WHEREFORE, the United States respectfully requests that defendants' Motion to Require Preservation of and Produce Rough Notes with Citation of Authority (Doc. No. 81) be denied.

## VI.     RESPONSE TO MOTION TO DISMISS ON GROUNDS OF SELECTIVE PROSECUTION (Doc. No. 82)

In the Motion to Dismiss on Grounds of Selective Prosecution (Doc. No. 82), defendant Brian DiPippa alleges, with no factual support whatsoever, that the government has charged him because the government has classified him as an extreme anarchist who holds extremist, antigovernment and anti-law enforcement beliefs.  He further alleges that, because of that classification by the government, "in conjunction with his alleged acts" on April 18, 2023, the government has decided to charge him in this case.  Defendant Brian DiPippa additionally claims, again with no factual support, that the charges in this case have been brought pursuant to a Department of Justice policy "directive that federal prosecutors should aggressively punish conduct relating to the protected First Amendment activities that spring from transgender issues." According to defendant Brian DiPippa, these purported facts demonstrate that the government has brought these charges "for a discriminatory purpose," which has "a discriminatory effect" and, therefore is in violation of his constitutional rights.  He characterizes this case as a "selective prosecution" warranting dismissal.  In support of this argument, defendant Brian DiPippa cites to Wayte v. United States, 470 U.S. 598 (1985) and United States v. Armstrong, 517 U.S. 456 (1996).

A selective prosecution claim "is not a defense on the merits of a criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  Armstrong at 463.  Because the Attorney General and United States Attorneys "retain 'broad discretion' to enforce the Nation's criminal laws…'the presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts

presume that they have properly discharged their official duties.' "  <u>Armstrong</u> at 464 (citations

omitted)

      In the instant case, defendant Brian DiPippa can present no evidence, let alone clear

evidence sufficient to rebut the presumption, to support his claim of selective prosecution.

      WHEREFORE, the United States respectfully requests that defendants' Motion to Dismiss

on Grounds of Selective Prosecution (Doc. No. 82) be denied.

## VII.   <u>RESPONSE TO MOTION TO REVEAL CONFIDENTIAL INFORMANT(S)</u><br><u>(Doc. No. 83)</u>

      In the Motion to Reveal Confidential Informant(s) (Doc. No. 83), defendant Brian DiPippa

cites to <u>Roviaro v. United States</u>, 353 U.S. 53, 60-61 (1957), for the proposition that the

government must disclose information relating to confidential informants where, under the

particular circumstances of the case, such disclosure could provide possible defenses to the crimes

charged.  He then goes on to generally allege that, "In this case, the testimony of any informant is

vital to the defense."  However, defendant Brian DiPippa has not cited to any evidence which was

obtained by the government, directly or indirectly, from a CI that will be either (a) introduced at

trial by the government, or (b) would be material in any way to his defense.

      Defendants are not entitled to disclosure of the identities and/or any information relating

to the government's informants who will not be called at trial.  Courts have long recognized that

effective law enforcement and the protection of the public interest require that the government be

permitted, absent exigent circumstances, to withhold the identity of informants.  <u>See</u> <u>Roviaro v.</u>

<u>United States</u>, <u>supra</u>.  The reason for this rule has been described as follows:

> A genuine privilege, on ... fundamental principal ..., must be recognized for the
> *identity of persons supplying the government with information concerning the*
> *commission of crimes*.  Communications of this kind ought to receive
> encouragement.  They are discouraged if the informer's identity is disclosed.
> Whether an informer is motivated by good citizenship, promise of leniency or

prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity -- to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him.  The government also has an interest in non-disclosure of the identity of its informers.  Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities.  Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship.  That the government has this privilege is well established, and its soundness cannot be questioned.

McCray v. Illinois, 386 U.S. 300, 308-09 (1967) (citations omitted).

The government's privilege will give way only if the defense can make an adequate showing that disclosure is "relevant and helpful to the defense of an accused" or "essential to a fair determination of a cause."  Roviaro, 353 U.S. at 60-61.  The defendant bears the burden of setting forth a specific need for disclosure.  United States v. Jiles, 658 F.2d 194, 197 (3d Cir. 1981), cert. denied, 455 U.S. 923 (1982).  Accord Pickel v. United States, 746 F.2d 176, 181 (3d Cir. 1984) ("The individual seeking disclosure has the burden of establishing the significance of the informant's testimony.").

This burden is an exacting one.  Mere speculation that disclosure would be helpful is not sufficient to override the government's privilege.  United States v. Rivera, 524 Fed. Appx. 821, 827 (3d Cir. 2013) (speculation that informant who completed the controlled buy would admit that defendant was not the seller insufficient to compel disclosure of informant's identity); Jiles, 658 F.2d at 197 ("[Defendant's] first reason, that as an eyewitness the informant may provide exculpatory information, is clearly not enough . . . .  The mere speculation that an eyewitness may have some evidence helpful to the defendant's case is not sufficient to show the specific need required by Roviaro."); United States v. Bazzano, 712 F.2d 826, 839 (3d Cir. 1983) (en banc), cert. denied, 465 U.S. 1078 (1984) (same).

Thus, a defendant must make a particularized showing that the informant can provide material evidence that aids the defendant in establishing a specific asserted defense. Absent such an affirmative showing, courts have repeatedly refused to compel the government to disclose an informant's identity. See, e.g., Pickel, 746 F.2d at 181 (defendants advanced "nothing more than speculation" and therefore "have not met their burden"); Jiles, 658 F.2d at 197 (same); Bazzano, 712 F.2d at 839 (same).

Here, defendant Brian DiPippa's motion fails to articulate any particularized need or assert a specific defense necessitating the disclosure of the identity of confidential informants. This claim is mere speculation and fails to establish the specific need for a disclosure required by Roviaro. See e.g., Jiles, 658 F.2d at 197 (mere speculation insufficient for defendant to meet burden for disclosure of informant); United States v. Zolp, 659 F. Supp. 692, 705 (D. N.J. 1987) (speculation that an informant's identity may assist the defense does not warrant disclosure).

WHEREFORE, the United States respectfully requests that defendants' Motion to Reveal Confidential Informant(s) (Doc. No. 83) be denied.

## VIII. RESPONSE TO MOTION TO SUPPRESS EVIDENCE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12(b)(3)(C) OR IN THE ALTERNATIVE TO RETURN PROPERTY PURSUANT TO RULE 41(g) AND FOR AN ORDER LIMITING THE SEARCH OF DUPLICATED DATA (Doc. No. 84)

In the Motion to Suppress Evidence Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) or in the Alternative to Return Property Pursuant to Rule 41(g) and for an Order Limiting the Search of Duplicated Data (Doc. No. 84) defendant Brian DiPippa alleges that the search warrant for his residence and the electronic devices found therein violated his rights under the Fourth Amendment. In particular, he alleges that the warrant "failed to particularly describe electronic 'devices and storage mediums' to be searched and seized and failed to establish a nexus between the electronic devices sought and the crime of civil disorder." See Motion at p. 1. "In

other words," according to defendant Brian DiPippa, "there is no probable cause to believe that evidence of the alleged civil disorder will be found in the electronic devices simply because they were located in the suspect residence."  See Motion at p. 6.

In addition, defendant Brian DiPippa characterizes the warrant as a "general" warrant which improperly authorized law enforcement officers "to conduct a general sweep for any and all devices capable of storing electronic data."  See Motion at pp. 3-4.  Accordingly, defendant Brian DiPippa argues that the evidence seized pursuant to the warrant should be suppressed.

Finally, as an alternative request for relief, defendant Brian DiPippa asks the Court to direct the government to return the seized devices to him pursuant to Rule 41(g) "because they are not contraband, the Defendant has a right to those possessions, and there is no evidentiary value to the physical devices."  See Motion at p. 1.

For the reasons set forth below, defendant Brian DiPippa's Motion should be denied.

### 1.     The Search Warrant for the Devices Was Supported by Probable Cause

### A.     Probable Cause for Search Warrants - Relevant Legal Standards

In approving or denying an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, …there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The legal standard for a district court judge reviewing the issuance of a search warrant is highly deferential.  [T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for…conclude[ing]' that probable cause existed.  Id. at 238-39 (quoting Jones v. United States, 362 U.S. 260, 271 (1960)).  A reviewing court may not conduct a de novo review of an issuing judge's probable cause determination.  Id. at 236.  "Because probable cause is a

'practical, nontechnical conception,' we are concerned with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " United States v. Stearn, 597 F.3d 540, 558 (3d Cir. 2010) (citing Gates 462 U.S. 231). "Although every affidavit ideally would contain direct evidence linking the crime with the place to be searched, a magistrate may issue a search warrant even without direct evidence." Stearn at 554. "Probable cause can be, and often is, inferred from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide evidence.' " Id.

### B.    The Affidavit Supporting the Search Warrant in This Case

The following excerpts from the Affidavit that was submitted in support of the search warrant shows that there was probable cause to believe that, (a) in preparing to commit these offenses, the defendants were in communication with other persons who share their anarchist beliefs, and (b) evidence of such communications, as well as evidence of the defendants' motive to commit the offenses, could be found on the devices.

8.      *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet…

9.      *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when…

13.      The FBI Pittsburgh JTTF has been investigating **B.D.** and **K.D.** for violations of the **TARGET OFFENSE**. As set forth in detail below, the **TARGET RESIDENCE** is the residence of **B.D.** and **K.D.**, who are husband and wife. The investigation revealed that **B.D.** and **K.D.** share the **TARGET RESIDENCE.**

18.     Investigators, including your Affiant, reviewed security video footage after these events. The videos show that, at approximately 4:30 p.m., individuals began gathering on Soldiers and Sailors Lawn, which is part of the Soldiers and Sailors property adjacent to the O'Hara Student Center. Most of these individuals were similarly dressed, many wearing all dark clothing with face coverings. As time passed, the group gathering at Soldiers and Sailors lawn grew larger. Shortly before 7:00 p.m., the group had amassed approximately 300-350 people and began to move North on University Place toward the O'Hara Student Center, where the Michael Knowles event was being held.

19.     At approximately [7:01 p.m.], the first "smoke bomb," referenced above, was ignited and was rolled under the police barricades in front of the Gardner Steel Building located on O'Hara Street (See Figure 2). Video footage and photographs shows a male dressed in green shoes, black pants, blue "Carhartt" jacket, black face mask, glasses and carrying a black satchel bag (male later identified as B.D.) as the individual responsible for rolling the device with his right hand…

22.     On April 3, 2023, the UPPD received a tip via the Wufoo application indicating a group of anarchist extremists planned to engage in acts of violence in an effort to disrupt a planned debate regarding transgender issues which was scheduled for April 18, 2023, at the University of Pittsburgh O'Hara Student Center. Complainant advised that this group of anarchist extremists meet Thursday evenings at the Big Idea Bookstore at 4812 Liberty Avenue, Pittsburgh, PA 15224. During one of these meetings, an individual referred to as "Des" stated the speaker event "was not going to happen" and subsequently passed out "zines," or small printed booklets, to meeting participants which provided instruction on how to make incendiary devices for arson and Molotov cocktails.

23.     Based upon the possible planning and preparation for the commission of acts of violence targeting the April 18, 2023 speaker event, the FBI Pittsburgh JTTF conducted surveillance of the Big Idea Bookstore on April 13, 2023. At approximately 9:02 p.m. on April 13, 2023, surveillance observed an individual arrive at the Big Idea Bookstore on a black and red Kawasaki motorcycle. The individual departed the Bookstore on the same motorcycle at approximately 10:32 p.m. Through subsequent review of photographs, FBI Task Force Officer (TFO) David Derbish was able to identify **B.D.** as the likely operator of the motorcycle observed on April 13, 2023.

24.     Review of video footage from April 18, 2023, identified a male believed to be **B.D.** donning a black face mask and glasses, and wearing green shoes, black pants, a black satchel bag, and a blue Carhartt jacket, accompanied by a female, believed to be **K.D.**, donning a white face mask and glasses and wearing black shoes, black pants, a white "puffy" jacket, and red scarf. The couple was observed on video on the outer edge of protesters gathered at the intersection of University Place and O'Hara Street at approximately 6:43 p.m. As the protest moved to the front of the O'Hara Student Center, the male was observed on video, at approximately 7:01 p.m., igniting the first of two "smoke bombs" and rolling it under police barricades. At approximately 7:13 p.m., the male can be seen on video igniting the second "smoke bomb" and ducking under a "Jews Say Never Again" banner. The unidentified banner holders appeared to lift the banner as the smoke device was released toward officers and the speaking event attendees…

26.     The residence of B.D. and K.D., as described more fully below, displays a red and black diagonally divided flag hanging from the second story balcony of the residence. This flag is known to investigators as being associated with anarchists.

33.     On or about May 12, 2023, investigators, including your Affiant, participated in a warrantless search of the trash outside of the TARGET RESIDENCE set on a public sidewalk. Investigators recovered various items of indicia belonging to B.D. and K.D. addressed to 407 Biddle Avenue Apartment 2… Investigators also recovered a printed copy of an article published to www.crimethinc.com titled "THE CITY IN THE FOREST: Reinventing Resistance for an Age of Climate Crisis and Police Militarization." According to the publication, CrimethInc. describes itself as "a rebel alliance – a decentralized network pledged to anonymous collective action – a breakout from the prisons of our age."…Lastly, investigators recovered a printed zine that appears to be a typed letter addressed to "Des" from B.D. discussing anarchist ideology. Review of the zine revealed the writing is likely a response to a zine previously given to the author from Des.

These paragraphs establish the defendants' involvement in the offenses under investigation, and the strong likelihood that they were working in concert with other people to commit the offense at the speaker event at the OSC.  These allegations in the Affidavit also demonstrate that the defendants' motive and intent to commit the offense stem from their anarchist beliefs, and that communications with others regarding their plans and motive for causing the disorder and for obstructing the police would likely be found in their devices.

Magistrate Judge Eddy therefore made a practical, common-sense decision, given all the circumstances set forth in the Affidavit, that there was a fair probability that evidence of the defendants' motive, intent and involvement in the offense could be found in the devices to be searched.

C.     The Language Regarding the Search of Devices Did Not Make the Warrant a "General Warrant"

Defendant Brian DiPippa alleges that the language of the warrant which authorized the agents to search for and seize "cellular phones, computers, and other devices or storage mediums that contain, or in which can be stored, evidence of TARGET OFFENSE" allowed law enforcement officers to "conduct a general sweep for any and all devices capable of storing

18

electronic data," and an "exploratory rummaging" which violated his rights under the Fourth Amendment.  Therefore, defendant Brian DiPippa argues, the evidence seized pursuant to the warrant should be suppressed.

The Fourth Amendment provides that a search warrant must "particularly describe the place to be searched, and the persons or things to be seized."  This provision prohibits "general warrants," which "authorize 'a general exploratory rummaging in a persons belongings.' "  United States v. Yusuf, 461 F.3d 374, 393 (3d Cir. 2006) (citing Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)).

Upon review of the warrant and its attachments in this instant case, it becomes clear that it is not a general warrant.  In describing the boundaries as to the items which could "be searched for and seized," Attachment B1 limits the agents to only "Evidence, contraband, fruits or instrumentalities of violations of Title 18, United States Code, Section 231(a)(3)."

Moreover, "courts agree that a warrant authorizing a broad search of computer files is reasonable in light of the nature of searching electronic documents."  United States v. DeWald, 361 F. Supp. 3d 413, 421 (M.D. Pa. 2019) (citing United States v. Karrer, 460 Fed.Appx. 157, 161-62 (3d Cir. 2012)).  Judge Brann in the DeWald case reasoned as follows:

> As the officers explained in the affidavit, given the nature of computer files and their familiarity with "the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities," it would be impossible to identify ex ante the precise electronic locations or file types that would house the suspected evidence.  The officer's broad analysis of the laptop's files, including searching through hidden and deleted files, was not exploratory rummaging; it was necessary to search for and seize evidence of DeWald's alleged wrongdoing.  Accordingly, the officer's discretion was sufficiently limited, and the warrant was not a general warrant.

DeWald, at 421-22 (citing United States v. Stabile, 633 F.3d 219, 237 (3d Cir. 2011) ("[I]t is clear that because criminals can - and often do - hide, mislabel, or manipulate files to conceal criminal

activity, a broad, expansive search of the hard drive may be required.").

The warrant in the case at bar similarly authorized the officers to conduct a broad and expansive search of the electronic devices - but only for evidence of violations of 18 U.S.C. § 231(a)(3). Based on the foregoing, this warrant was not a general warrant.

Finally, defendant Brian DiPippa requests in the alternative that the Court direct the government to return the electronic devices to him because (a) they are not contraband, (b) he has a right to possess them, and (c) the devices have no evidentiary value. The government's response is that three of the devices (defendant Brian DiPippa's cell phone, defendant Krystal DiPippa's cell phone, and the desktop computer) have evidentiary value. More specifically, defendant Brian DiPippa's phone contains correspondence regarding plans for the speaker event, including an offer from another individual to "extract" Brian DiPippa from the event if needed. Defendant Krystal DiPippa's cell phone contained location data which placed her in the vicinity of the OSC at the time the offense was committed. Their desktop computer contained a video of the explosive being thrown at the officers behind the OSC on April 18, 2023. Therefore, defendant Brian DiPippa's request that these devices be returned to the defendants should be denied.

With respect to other electronic storage devices, the government is willing to return them to defendant Krystal DiPippa, or a person designated by the defendants, at a mutually agreeable place and time.

WHEREFORE, the United States respectfully requests that defendants' Motion to Suppress Evidence Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C) or in the Alternative to Return Property Pursuant to Rule 41(g) and for an Order Limiting the Search of

Duplicated Data (Doc. No. 84) be denied.

IX.    **RESPONSES TO DEFENDANT BRIAN DIPIPPA'S MOTION TO DISMISS COUNT TWO OF THE INDICTMENT ON VOID FOR VAGUENESS GROUNDS (Doc. No. 85) AND DEFENDANT KRYSTAL DIPIPPA'S MOTION TO DISMISS INDICTMENT (Doc. No. 86)**

In defendant Brian DiPippa's Motion to Dismiss Count Two of the Indictment on Void for Vagueness Grounds (Doc. No. 85) defendant Brian DiPippa seeks the dismissal of the charge at Count Two on the purported basis that 18 U.S.C. § 231(a)(3) is overbroad and unconstitutionally vague. Defendant Brian DiPippa makes several specific arguments in support of his request for dismissal, each of which arguments will be addressed in turn by the government below. Similarly, in Doc. No. 86, defendant Krystal DiPippa seeks dismissal of Counts One and Two on the ground that § 231(a)(3) is unconstitutional (a) under the Commerce Clause; (b) because it is overbroad, and (c) because it violates the Fifth and Sixth Amendments. These arguments will be separately addressed below as well.

     A.     **The Offense Conduct**

The government intends to establish the following facts at trial to prove the defendants' guilt as to the charges in this case[1]:

On April 18, 2023, the University of Pittsburgh hosted a guest speaker event, featuring Michael Knowles, at the O'Hara Student Center ("OSC"). The topic for this event was "Womanhood and Transgenderism." This event attracted many attendees, as well as many protesters. The event was scheduled to begin at 7:30 p.m. Between 6:30 p.m. and 7:00 p.m., attendees and protesters began to head toward the entrance to the OSC. The attendees lined up outside the entrance while the protesters gathered near the attendees on O'Hara Street, vocalizing their views and displaying signs expressing their views. Until approximately a few minutes past

---

[1] The evidence summary set forth herein does not include all the evidence which the government intends to offer.

7:00 p.m., the events in the area surrounding the OSC were mostly lawful[2] and entirely non-violent.

Shortly after 7:00 p.m., this changed.  An effigy of Michael Knowles was ignited by protesters on O'Hara Street and, shortly thereafter, a flaming smoke-generated device in a glass jar, was ignited and rolled by defendant Brian DiPippa in and among the attendees and the police officers who were there to maintain order and protect the attendees and protesters at the event. Approximately twelve minutes later, a second similar device was ignited and rolled from the protester side of the barricade by defendant Brian DiPippa, in and among the line of attendees and police officers outside the event, causing them to scatter to avoid injury from the flame and smoke. Defendant Brian DiPippa crouched behind defendant Krystal DiPippa in an effort to conceal himself as he ignited this second device.  Several police officers rushed to re-enforce the barricades which separated the protesters from the attendees.

At approximately 7:28 p.m., the defendants, along with several protesters, then walked to the rear of the OSC, which had windows to the second floor where the Knowles event was being held and was about to begin.  Upon seeing the movement of protesters to the back of the OSC, approximately a dozen police officers rushed to that area to create a personnel barrier separating the protesters from the building.  At this point, the defendants were in and among the protesters. Defendant Brian DiPippa, while shielded and concealed by defendant Krystal DiPippa, ignited an explosive firework type device and tossed it into the group of police officers.  The device exploded and caused injuries to several of the officers.

The defendants' conduct clearly was not a lawful exercise of rights guaranteed and protected by the First Amendment.  In fact, the defendants' conduct constituted a violent attack on

---

[2] The government describes the conduct as "mostly" lawful because the non-violent protesters had not obtained the permit required for this protest.

the attendees and non-violent protesters, as well a serious and dangerous assault on the police officers.

**B.      The Recent Decision in the <u>Pugh</u> Case**

In their Motions attacking the constitutionality of § 231(a)(3), both defendants cite to numerous decisions of the Supreme Court, as well as several Courts of Appeals, addressing the constitutionality of a variety of statutes.   However, neither defendant has cited to any cases addressing the constitutionality of § 231(a)(3).  Most important, neither defendant has discussed a recent Eleventh Circuit case which generally addresses the constitutionality of § 231(a)(3), and directly addresses several of the defendants' arguments described herein.  That case is <u>United States v. Pugh</u>, 90 F.4th 1318 (11th Cir. 2024).   The Court in <u>Pugh</u> upheld the constitutionality of § 231(a)(3).   The analysis and reasoning of the Court in that case is persuasive for purposes of resolving the defendants' claims regarding § 231(a)(3) in the instant case.

**C.      Section 231(a)(3) is Not Unconstitutionally Vague**

The first argument made by defendant Brian DiPippa is that § 231(a)(3) is "replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what conduct is permitted."  Defendant Brian DiPippa specifically directs the Court to the "any act to obstruct, impede or interfere" language from the statute.  Upon review of the <u>Pugh</u> Court's analysis of these terms, it becomes clear that the defendant's vagueness argument in the instant case should be rejected.   The Court in <u>Pugh</u> simply examined the dictionary definitions of these terms, which demonstrate their clarity. "Obstruct" means "to block or close up by an obstacle."  <u>Id</u>. at 1330.  "Impede" means "to interfere with the progress of" and "to block." <u>Id</u>.  In the context of § 231(a)(3), the term "interfere" means to hinder a law enforcement officer or fireman with more than mere words.  See <u>Pugh</u> at 1330.   Indeed, a person of ordinary

intelligence can understand these terms.

**D.      Section 231(a)(3) is Not Overbroad in Violation of the First Amendment**

Both defendants argue that § 231(a)(3) is overbroad in violation of the First Amendment. The defendant in <u>Pugh</u> made similar arguments, but the Court rejected those arguments. The Court in <u>Pugh</u> began its overbreadth analysis by recognizing that "a law may be invalidated as [facially] overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." <u>Id</u>. at 1328 (citing <u>Ams. For Prosperity Foundation v. Bonta</u>, 141 S.Ct. 2373, 2387 (2021). To establish unconstitutional overbreadth, a defendant "must carry a heavy burden." <u>Id</u>. at 1329. Specifically, a defendant "must establish 'from the test of the [challenged provisions] and from actual fact that a substantial number of instances exist in which [the provisions] cannot be applied constitutionally.' " <u>Id</u>. (citations omitted). The Court in <u>Pugh</u> further addressed the defendant's burden, stating that "Courts have 'vigorously enforced the requirement that a statute's overbreadth be <u>substantial</u>, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.' " <u>Id</u>. (emphasis in original; citations omitted).

The <u>Pugh</u> Court addressed the defendant's overbreadth argument in that case (identical to defendants' overbreadth argument in the instant case) that the statute applies to a range of speech and expressive conduct, including yelling at police, "flipping off" officers, or recording police activity with a cell phone. In rejecting this argument, the Court in <u>Pugh</u> held, "we cannot say Section 231(a)(3) affects much speech at all. 'The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.' " <u>Id</u>. at 1329. (citations omitted). Regarding the specific terms in the statute which would allegedly hinder speech, the Court stated: "It is hard to see how either 'obstruct' or 'impede' apply to speech or expressive conduct, except at the margins." <u>Id</u>. at 1330. As indicated above,

with respect to the word "interfere" in § 231(a)(3), the <u>Pugh</u> Court found it to carry a slightly broader meaning.  Nevertheless, upon applying the canon of <u>noscitur a sociis</u>, the Court concluded that "interfere" in § 231(a)(3) is cabined by its surrounding words, "obstruct" and "impede," and therefore should be read "as prohibiting someone from hindering a law enforcement officer or fireman with more than mere words." <u>Id</u>.

The Court in <u>Pugh</u> then went on to conclude that "[i]t is obvious that the statute does not criminalize a substantial amount of protected activity." <u>Id</u>. at 1330-1331.  The defendant in <u>Pugh</u> (like defendants in the case at bar), "cannot identify from the text of § 231(a)(3) or from any actual prosecutions that a 'substantial number of instances exist in which [the provisions] cannot be applied constitutionally.' " <u>Id</u>. at 1331 (citations omitted).

Defendant Brian DiPippa also avers that the language "incident to and during the commission of a civil disorder" in § 231(a)(3) is unconstitutionally vague and overbroad, particularly because "civil disorder" could apply to "virtually any tumultuous public gathering to which police might be called, not just large scale protests or riots."  Motion at p. 6.  However, this concern is directly addressed in § 232(1), where "civil disorder" is defined as and limited to a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of…injury to the property."  Such language clearly is directed toward conduct involving acts of violence, and would not apply to any "tumultuous public gathering" involving mere speech or expressive conduct.  The term "civil disorder" as used in § 231(a)(3) is therefore neither unconstitutionally vague nor overbroad.

### E.    Section 231(a)(3) Has a Scienter Requirement

Defendant Brian DiPippa also maintains that, because § 231(a)(3) contains no scienter requirement, the statute creates a "trap for those who act in good faith" (citing <u>Colautti v. Franklin</u>,

439 U.S. 379, 395 (1979)), and leaves it to police, prosecutors and judges to decide whether the statute requires knowledge or specific intent or neither."  Motion at p. 7

Where a federal statute is silent as to the requisite *mens rea*, a court will "read into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct."  United States v. Elonis, 135 S. Ct. 2001, 2010 (2015) (internal quotation marks omitted).  The government submits that a *mens rea* of knowledge is sufficient to meet this standard for purposes of Section 231(a)(3).  See United States v. Mechanic, 454 F.2d 849, 854 (8th Cir. 1971).  It should be noted, however, that five years after the Mechanic decision, another panel from the Eighth Circuit held that a higher standard - "willfully and knowingly" - applies to Section 231(a)(3).  See United States v. Casper, 541 F.2d 1275, 1276 (1976).  The Court in the case at bar need not decide the issue at this juncture as the Indictment alleges this higher standard.  The question of which *mens rea* is required here can thus await the drafting of the jury instructions.

**F.      Section 231(a)(3) Does Not Exceed Congress's Authority to Regulate Interstate Commerce**

Defendant Krystal DiPippa argues that § 231(a)(3) is unconstitutional because "it exceeds Congress's authority to regulate interstate commerce."  See defendant Krystal DiPippa's Motion at p. 8.  This argument, which is virtually identical to an argument made by the defendant in the Pugh case, "turns on whether the jurisdictional element of the statute - the requirement that the civil disorder 'in any way or degree obstruct [], delay [], or adversely affect [] commerce' - is enough to limit the statute's scope to constitutional applications."  Id. at 1325.  In resolving this question in the affirmative, the Court in Pugh set out a lengthy analysis.

The first step in the analysis was to identify which category of interstate activity was being regulated by Congress with the passage of § 231(a)(3).  The Court determined that the language

of § 231(a)(3) actually invokes all three of the broad categories identified in <u>United States v. Lopez</u>, 514 U.S. 549 (1995). <u>Pugh</u> at 1326. "Congress, therefore, invoked the full scope of its power in Section 231(a)(3)." <u>Id</u>.

Defendant Krystal DiPippa seems to be arguing that, in order to properly exercise its power under the Commerce Clause, a statute enacted pursuant to the authority of the Commerce Clause must regulate a specific "commodity" or "good," or a specified "economic activity." There is no legal basis for this argument. As long as the "statute expressly requires that the prescribed conduct have an appropriate nexus with interstate commerce, courts can 'ensure through case by case inquiry' that each application of the statute should not be struck down as being facially unconstitutional." <u>Id</u>.

The next argument advanced by defendant Krystal DiPippa is that the jurisdictional element of § 231(a)(3) lacks the requisite nexus with interstate commerce because the act being regulated - obstruction, impediment or interference with law enforcement - need not affect interstate commerce. <u>See</u> Doc. No. 86 at pp. 11-13. This particular argument was also raised in the <u>Pugh</u> case and was rejected. <u>See</u> <u>Pugh</u> at 1327-28. In rejecting the argument, the <u>Pugh</u> Court discussed <u>Russell v. United States</u>, 471 U.S. 858 (1985), which dealt with a challenge to the jurisdictional element of 18 U.S.C. § 844(i), the federal arson statute.

In <u>Russell</u>, the Supreme Court upheld the constitutionality of § 844(i), which criminalized the arson of "any building…used…in any activity affecting interstate commerce." Section 844(i) did not require proof that the criminal act of arson itself was directly linked to interstate commerce. Instead, under § 844(i), the government was required to prove that the crime was committed against the building. "There was no need for the jury finding that the arson itself affected interstate commerce." <u>Pugh</u> at 1327. Applying this rationale to § 231(a)(3), the Court in <u>Pugh</u> held: "Just

as Congress had the power to outlaw the burning of commercial buildings in <u>Russell</u> because of the buildings' effect on interstate commerce, Congress has the power to outlaw interference with police as they try to eliminate civil disorders that affect interstate commerce." <u>Id</u>. at 1327-28.

The government submits that this reasoning is persuasive and that defendant Krystal DiPippa's argument is not. At the trial in the instant case, the government will establish the civil disorder's impact on interstate commerce, as described <u>infra</u> in Section XI of this Omnibus Response. Section 231(a)(3) is a proper exercise of Congress's power to outlaw interference with police as they try to eliminate civil disorders that affect interstate commerce, as occurred in this case.

## G.   Lack of Congressional Findings Regarding Effects on Interstate Commerce Does Not Invalidate § 231(a)(3)

Defendant Krystal DiPippa alleges that there was no Congressional findings relating to the interstate commerce element when § 231(a)(3) was enacted. Assuming this allegation to be accurate, the government's response is that no such "findings" by Congress are required for a statute to pass constitutional muster. In short, it just doesn't matter.

## H.   The Indictment Provides Adequate Notice and Does Not Violate the Fifth or Sixth Amendments

Both defendants argue that, if the Court denies their requests to dismiss the Indictment based on the arguments outlined above, the Court should alternatively dismiss the Indictment because it (a) fails to provide them with adequate notice, and (b) fails to assure that the grand jury returned the Indictment in compliance with the Fifth and Sixth Amendments.

At this stage, "an indictment [is] sufficient so long as it '(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared

to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007) (quoting United States v. Vitillo, 490 F.3d 314 (3d Cir. 2007)).

As to the elements set forth in the Indictment Memorandum, they are entirely consistent with the language of the statute and the elements of § 231(a)(3) as enumerated by the Court in Pugh.[3]  Moreover, there is no basis for defendant Krystal DiPippa's averment that the grand jury was improperly instructed as to the elements of § 231(a)(3).

Upon review of the language of Count Two, it becomes very clear that it describes, in detail, the acts which the defendants allegedly committed to violate § 231(a)(3).  These allegations provide more than adequate notice to the defendants as to the elements of the statute and the conduct which violated the statute on April 18, 2023.  The argument regarding the insufficiency of the language of the Indictment is meritless.

WHEREFORE, the United States respectfully requests that the defendants' Motions filed at Doc. Nos. 85 and 86 be denied.

## X.  RESPONSE TO MOTION TO ADOPT AND PARTICIPATE IN THE PRETRIAL MOTIONS AND BRIEFS OF CO-DEFENDANT (Doc. No. 87)

The government does not oppose defendant Krystal DiPippa's Motion to Adopt and Participate in the Pretrial Motions and Briefs of Co-Defendant (Doc. No. 87)

## XI.  RESPONSE TO MOTION FOR BILL OF PARTICULARS (Doc. No. 89)

In her Motion for Bill of Particulars (Doc. No. 89) defendant Krystal DiPippa requests that the Court order the government to file a bill of particulars, providing her with the government's accusation as to the necessary element of interstate commerce.  (See Doc. No. 89, p. 1-2).

---

[3] As noted in a previous section of this Omnibus Response, the government has charged that the *mens rea* element for §231(a)(3) is "willfully," but the Court may determine prior to trial that the lesser standard of "knowingly" is applicable.

Rule 7(f) of the Federal Rules of Criminal Procedure provides,

The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

"The purpose of a bill of particulars is to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial, and to protect him against a second prosecution for an inadequately described offense." United States v. Urban, 404 F.3d 754, 771-72 (3d Cir. 2005) (internal quotations and citations omitted).  The district court has discretion to deny a motion for a bill of particulars where the indictment presents the essential facts.  See United States v. Moyer, 674 F.3d 192, 203 (3d Cir. 2012).  A motion for a bill of particulars should be granted only where "an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989) (internal citations omitted).  A defendant's request for "the 'when, where and how' of any overt acts not alleged in the indictment [is] tantamount to a request for 'wholesale' discovery of the Government's evidence,' which is not the purpose of a bill of particulars under Fed. R. Crim. P. 7(f)." United States v. Armocida, 515 F.2d 49, 54 (3d Cir. 1975), cert. denied, 423 U.S. 858 (1975) (citing United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1972), cert. denied, 405 U.S. 936 (1972); United States v. Lebron, 222 F.2d 531, 535-36 (2nd Cir. 1955)).

Defendant Krystal DiPippa is charged at Count One of the Indictment with conspiring with persons both known and unknown to the grand jury, including but not limited to Brian DiPippa, to commit offenses against the United States, those offenses being the Obstruction of Law Enforcement During Civil Disorder, on or about April 18, 2023.  Defendant Krystal DiPippa is charged at Count Two of the Indictment with willfully committing and attempting to commit an

act to obstruct, impede and interfere with a law enforcement officer lawfully engaging in the performance of the officer's official duties, incident to and during the commission of a civil disorder which obstructed, delayed and adversely affected commerce and the movement of articles and commodities in commerce, to wit: the defendants incident to and during the commission of a civil disorder in the vicinity of the O'Hara Student Center at the University of Pittsburgh in the Oakland section of the City of Pittsburgh, on or about April 18, 2023, which disorder obstructed, delayed and adversely affected interstate commerce and the movement of articles and commodities in interstate commerce, did move and attempt to move steel barriers and use an ignitable smoke generating device and an ignitable firework to obstruct, impede and interfere with law enforcement officers lawfully engaged in the performance of official duties.

The charges are not overly complex and the Indictment sufficiently provides the defendant with adequate notice of the essential facts of the case.

When ruling on a motion for a bill of particulars, the district court "should consider all information that has been disclosed to the defendant in the course of the prosecution, whether or not included in the indictment." United States v. Grier, No. 2:12-cr-161, 2012 WL 5614087, at *3 (W.D.Pa. Nov. 15, 2012) (citing United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972)). In Grier, Senior United States District Judge Terrence F. McVerry denied a motion for a bill of particulars. 2012 WL 5614087 at *3. In denying the motion, Judge McVerry noted that while the information requested by the defendant could very well be helpful to him, his requests for specific details and facts were "tantamount to requests for wholesale discovery of the government's evidence, which is not a proper purpose for a bill of particulars." Id.

The government has provided the defendant with extensive discovery in this case. The government has disclosed to the defendant numerous records, including, among other things,

photographs, affidavits, audio and video files.  Most important, for purposes of addressing this request for a bill of particulars, the government has disclosed its information relating to the basis for the government's assertions regarding the nature of the impact on interstate commerce.  For example, the government has provided the defendants with the affidavit for the search warrant that was executed at their residence.  That affidavit contains statements from one of the lead investigators in this case regarding the government's evidence supporting the "affecting interstate commerce" element.  Specifically, paragraph 21 of the affidavit provides as follows:

> 21.  Intercollegiate Studies Institute (ISI) is a non-profit 501(c)(3) educational organization funded by thousands of individuals and dozens of charitable foundations in Pennsylvania and around the country. ISI is headquartered in Wilmington, Delaware. Their mission is to provide access to speakers and presenters for college students around the country. They focus on the freedom of speech and the right to peacefully assemble. ISI was responsible for organizing and paying for the speaking event on April 18, 2023, at the University of Pittsburgh featuring Michael Knowles and Brad Polumbo. ISI paid approximately $10,000 each to Michael Knowles and Brad Polumbo to have them speak at the event, and approximately $2,500 to the moderator, Leah Libresco Sargeant. There were two components scheduled to take place on April 18, 2023. These included a 90-minute organized debate and a 60-minutes Very Important Persons (VIP) meet and greet with ISI staff, students, and Michael Knowles. Due to safety concerns arising from the activity outside of the O'Hara Student Center on the night of April 18, 2023, UPP made the decision to end the event at approximately 9:00 p.m., thereby cancelling the promised "Meet and Greet" that was supposed to occur afterward. Consequently, ISI paid the speakers and moderator a total of $22,500 plus travel and lodging expenses for a service that was not fulfilled to the extent of the terms agreed upon. In addition, ISI incurred security costs totaling approximately $27,796.04 for the following services: $16,925.16 to the University of Pittsburgh for 28 UPP officers and 11 UPP supervisors for six (6) hours; $3,006.25 to a private security company called RIP Security; and $7,864.63 to Michael Knowle's private security, to include travels and lodging expenses. Despite the total security costs, protection was not adequate enough to maintain a safe enough environment in order to conduct the event as planned.

Finally, the defendant is invited to come to the United States Attorney's Office at a mutually agreeable time to discuss or examine that evidence again.

Given all of the materials that the government has disclosed to the defendant in this case, the defendant has more than enough information to adequately prepare a defense. The defendants will not face any prejudicial surprise at trial.

WHEREFORE, the United States respectfully requests that defendant's Motion for Bill of Particulars (Doc. No. 89) be denied.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

By:      *s/Shaun E. Sweeney*
SHAUN E. SWEENEY
Assistant U.S. Attorney
PA ID No. 53568